Fort Smith Gas Company *v.* Wiseman.

4-3548

Opinion on rehearing delivered October 1, 1934.

*Miles, Armstrong & Young*, for appellant.

*Trieber & Lasley*, for appellee.

Baker, J., (on rehearing). Upon the rehearing in this cause, we hold that the original opinion is erroneous, and that this opinion should be substituted for the one rendered on June 18, 1934.

There was passed at the 1933 session of the General Assembly (Acts 1933, p. 203) act 72, entitled, "An Act to Create a Fact-Finding Tribunal in the Corporation Commission." This tribunal was given the power, and it was made its duty, to investigate and make a finding of all facts entering into or forming the basis of

rates to be charged for any service supplied by any public utility "furnishing gas, water, light, heat or power; producing, generating, transmitting or distributing gas, water, light, heat or power; or furnishing telephone, telegraph or street railway service."

To raise funds to defray the expenses of this tribunal, it was provided in § 8 of the act that each public utility subject to the provisions of the act shall file with the tribunal "a sworn statement showing its gross earnings from property in this State for the preceding calendar year, and at the same time shall remit to the State Treasurer the sum of $2 for each $1,000 of such gross earnings as a fee for the fact-finding facilities afforded by this act, which fee shall be in addition to all property, franchise, license or other taxes, fees or charges now or hereafter prescribed by law. * * * The tribunal is hereby authorized to inspect the income tax return of any public utility for the purpose of checking up its gross earnings."

The Fort Smith Gas Company is engaged in the distribution of natural gas in the city of Fort Smith. The gas which it distributes is purchased from various pipe line companies. As required by the act from which we have quoted, the Fort Smith Gas Company made report of its gross earnings for the year 1932, from which it appeared that gas which had been furnished by the pipe line companies to the Fort Smith Gas Company at a cost of $214,769.01 had been distributed to the consumers for the price of $407,588.83. The Fort Smith Gas Company reported its gross earnings to be the difference between what it had paid for the gas and the price received for it, and made a tender of the tax imposed by § 8 of the act on that basis. The tender was declined by the Commissioner of Revenues, who insists that the tax should be paid on the whole amount for which the gas was sold, and not on the difference between the purchase and the sale price. The court below sustained that contention, and entered a judgment accordingly, from which is this appeal.

The question presented here for our determination and decision is whether the term "gross earnings," as

used in act 72, was intended by the Legislature to be synonymous with "gross receipts." In attempting to decide what the Legislature meant by "gross earnings," as the same appears in § 8 of said act, we think recourse should be had to the act itself, and with whatever authority we may be able to find, to aid in a determination of the legislative intent.

Act 72, appearing on page 203 of the Acts of Arkansas of 1933, is a regulatory statute, whereby the fact finding tribunal, organized as a bureau of the corporation commission, is empowered, by the act, to make investigations under the prescribed methods and procedure as set forth in said act, to determine and fix a basis upon which rates may be charged by utility companies doing business in the State. This investigation, for purposes of regulation, as will appear from § 2 of the act, is such that a person, firm, association, corporation, trustee, receiver or lessee, furnishing gas, water, light, heat, power; producing, generating, transmitting, or distributing any of the said products, or furnishing telephone, telegraph, or street railway service, may be made the subject of such investigation for the purpose of finding facts necessary to determine rates that may be charged. It will be observed in reading § 2 that the Legislature had in mind that one selling or distributing any of the products mentioned was supplying a service in the same sense that a service is supplied by telephone, telegraph, or street railway. Whether the utility sells commodities or transportation, the utility is treated as supplying "services" to the public. It was certainly not the purpose of the Legislature to discriminate as between one generating electricity or producing gas from its own wells or plants, and one who also renders a service by selling transportation on the street car system, or provides means for communication by telephone and telegraph. The rates to be charged for the rendition of this service, whether in the distribution of a commodity or in the production and sale of it, and the service rendered by a street railway company, or a telephone or telegraph company, come under the same regulatory power of the Fact Finding Tribunal.

The purpose of the Fact Finding Tribunal, the power or authority granted to it, the method of procedure provided, demonstrate that its function is purely regulatory, and that it is brought into being in the exercise of the police power of the State.

In order that it might become operative or effectual, it was necessary that money, or funds be raised, with which to pay expenses, including salaries, and this is provided for under § 8 of the act, and it is in this section that the term "gross earnings" is used.

Section 8 provides that: "Each public utility subject to the provisions of this act shall file with the tribunal a sworn statement showing its gross earnings from property in this State for the preceding calendar year, and at the same time shall remit to the State Treasurer the sum of $2 for each $1,000 of such gross earnings as a fee for the fact-finding facilities provided by this act, which fee shall be in addition to all property, franchise, license or other taxes, fees or charges now or hereafter prescribed by law."

It will be observed that the word "fee" is used instead of "tax," and we think that word is used in the sense that it is a "charge fixed by law for services of public officers or for the use of a privilege under the control of the Government." The charge made is of the same kind and class as that usually made, as authorized by statute, in municipalities for license fees, which are assessed or fixed by city councils, not as revenue charges, but in order that the regulations, inspections, etc., may be had without expense to the municipality. The law in such matters is too well known and recognized to require citation of authorities.

The principal case relied upon by learned counsel for appellant is *District of Columbia* v. *Georgetown Gaslight Co.*, 45 Appeals, District of Columbia, 63. We think that this case is not applicable and furnishes us no aid in the determination of the question involved here.

This District of Columbia case arose under an act of Congress of July 1, 1902, and the act itself shows that the words "gross receipts" and "gross earnings" were not intended to be used as meaning the same thing. We

agree with learned counsel that it is a well-reasoned case, but that court also recognized the fact that the terms "gross receipts" and "gross earnings" are very frequently regarded as equivalents.

A careful reading of the above case will disclose the fact that the act under consideration was a tax for revenue upon the "gross earnings," and not a fee for regulation. Each national bank was required to pay 6 per cent.; each gas company 5 per cent.; each electric lighting and telephone company 4 per cent. It provided also that street railway companies should continue to pay 4 per cent. per annum on "gross receipts," and insurance companies 1½ per cent. from premium receipts. The court followed the principle that our court has also approved—that an act imposing a special tax should be construed strictly against the State, and in favor of the taxpayer, and to the effect that the gas company was permitted to take from its "gross earnings" the amount expended or invested by it in the purchase of raw materials in the production of its commodity, in order to arrive at the basis for the tax. If we follow the same principle, as announced in the District of Columbia case, and treat the act as one of taxation, for the mere purpose of producing revenue, and not a fee, which the act calls the charge, then necessarily the authorities are ample to support the contention that earnings cannot be determined except by taking from the gross income, or "gross receipts," all of the expenses of the production of said commodity, and necessarily this would include whatever investments of capital were made in raw material, incidental to the production of the commodity from which the gross income was derived.

It is true that this court has held that a law imposing a special tax is to be construed strictly against the Government and favorably to the taxpayer. *McDaniel* v. *Byrkett*, 120 Ark. 295, 179 S. W. 471.

While we recognize the justice of that argument and would not impair the effect of the decision in the last cited case, we cannot concede that it is authority to defeat what we believe to be the legislative intent in the case under consideration.

Counsel for appellant in this case agree that the Fort Smith Gas Company should pay on the amount remaining, after deducting the cost of the gas purchased by it, and without any deduction of any cost of operation, or any return on its investments, or any tax or other charge of any kind. This is a fair concession in order to present its real contention to this court, but, if the District of Columbia case is authority, and if it should be followed by this court, it is also authority for deductions that should be made for cost of operation, etc.

But this question as to cost of operation, as we think, is conceded by all the parties, is settled in the case of *Railway Co.* v. *Shinn,* 52 Ark. 93, 12 S. W. 183. Quoting Chief Justice COCKRILL, the statement of the case is as follows:

"The company is known as the Dardanelle & Russellville Railway Company, and sells tickets to passengers and issues bills of lading for freight from the town of Dardanelle to Russellville and from Russellville to Dardanelle. It maintains a passenger ticket office, and a warehouse for the receipt of freights in the latter town. To facilitate the transaction of its freight and passenger business, it entered into a written agreement with Shinn, by the terms of which the latter agreed (to quote from the contract) 'to ferry all passengers, freight, baggage, mail, express matter, live stock and other kinds of freight, presented for ferriage by the party of the second part (the company) in the course of transportation by it, together with such conveyances as may be necessary to convey and transfer the same with dispatch and safety across the Arkansas River. * * * For and in consideration of which ferriage, and the services in regard thereto, the party of the second part hereby agrees to pay to the party of the first part (Shinn) one-fifth of the actual gross earnings of the railway, the party of the second part, on all passengers, freight, mail, express or other matter of every kind and nature whatsoever, carried across the said river either way.'

"Under the agreement the company transported its freights from the terminus of its track, across the ferry to its destination in Dardanelle, and from Dardanelle to

the railway at its own cost, and accounted to Shinn for one-fifth of the gross amounts earned thereby, and for the same proportion of the gross receipts for mail and express matter. It let the contract to haul its passengers, to a transfer company; which ostensibly charged twenty-five cents for transporting each passenger to or from the terminus of the track and points in the town of Dardanelle. The passenger vehicles were carried over the ferry without charge by Shinn under the impression that they were acting for the railway company, as a continuation of its line. The railway company sold the hack tickets, and out of the proceeds paid the transfer company twenty cents for their services, and retained five cents as a commission for selling such tickets, and as pay for the transfer company's ferriage for their hacks. The fare of the railway proper, between Dardanelle and Russellville, was fifty cents, which sum added to the hack fare made seventy-five cents for a complete ride between the two towns. Passengers were not required to purchase the hack tickets, and the railway fare entitled them to free ferriage without transportation from the terminus of the track to the ferry. The railway company accounted to Shinn for one-fifth of the amount collected by them as railway fare, that is, ten cents on each passenger and one-fifth of the five cents retained by them on the sale of each hack ticket.''

''Shinn contended that he was entitled to five cents for each hack ticket sold, as being a part of the gross earnings contemplated by the contract. The railway company insisted that the transfer company was not a part of its system, and what it earned was a matter of no concern to Shinn. The latter instituted this suit to recover the difference between the amount he received and what he claimed. The cause was tried without a jury before the circuit judge, who heard testimony establishing the facts above detailed, and found therefrom that Shinn was entitled to recover. The only ground assigned for a new trial is that the finding is not sustained by the facts.''

In this case it is stated that the railroad company paid four-fifths of the expense for crossing the river and

retained one-fifth, and in its settlement with Shinn was willing to pay him the one-fifth part of the five cents retained, claiming that the five cents was its "gross earnings," because of the fact that it had paid twenty cents of the twenty-five-cent charge for transfer across the river. The controversy arose because of the fact that the railway company construed the term "gross earnings" to be the one-fifth part of the charge, five cents, which it retained, and Shinn contended that "gross earnings" meant the full amount received, or the twenty-five cents.

In the consideration of this case, it should be kept in mind that the railroad company had nothing to sell, except its service, transportation; that it actually received, as between it and Shinn, only the five cents, but from the passengers it received twenty-five cents, though it paid to the transfer company twenty cents of that amount. The railroad company bought a part of the transportation, part of the service it sold, the part that was in dispute, just as the gas company in this case bought the gas that it resold to its consumers.

This court, in deciding that issue, held that the term "gross earnings" meant all that the railroad company had received, including this twenty-five-cent charge for each passenger transported. This case was decided at the May term of the Supreme Court in 1889, and, by its decision, gave to the term "gross earnings" the exact meaning contended for, of the same expression by the appellee in this suit. This particular case has never been overruled or modified, nor has the legal definition given by this court to the words "gross earnings" been changed in any particular.

Moreover, act 72 of Acts of 1933, shows the Legislature knew approximately what the work of regulation would cost. The fixing of the charges and appropriation determines that fact, and we think we can correctly assume it had some information in regard to the amount of fee or charge to make or place, so that payment by the utilities for the functioning of this regulatory plan, to which they were to be subjected, would be just.

It is apparent the fee fixed was intended to rest ratably and equitably upon such utilities. We cannot believe it proposed to fix a charge on a street railway which sells service only upon a basis of the gross amount of money received, and upon a gas company upon a basis of the gross profits only.

A street railway system might conceivably be organized with a million dollars capital stock, and use it all in its equipment to render the service for which it charges. The gas company organized, for a like sum, could spend one-half or three-fourths of its capital in a distribution system, and employ the remainder of its capital in the purchase of gas for distribution, and the total intake or receipts of the two corporations be the same. The two have employed the same capital, but in a different manner. The Legislature certainly meant they should pay equally. If one received or took in but a third part of what the other got, it should pay ratably. This construction eliminates expenses of bookkeeping, the costs of tax experts, controversies as to proper charges and deductions.

The court is of the opinion that the term "gross earnings," used in act 72 of the Acts of 1933, meant the entire receipts, without deduction for any expenditure, or any cost of operation, or other expense or cost of the service.

The act employs the expression, "gross earnings" as synonymous with "gross receipts," as in the case of *Railway* v. *Shinn, supra.*

The rehearing should be granted, and the judgment of the circuit court should be affirmed.

It is so ordered.

SMITH, McHANEY and BUTLER, JJ., dissent.

SMITH, J., (dissenting). There was passed at the 1933 session of the General Assembly (Acts 1933, page 203) act 72, entitled, "An Act to Create a Fact-Finding Tribunal in the Corporation Commission." This tribunal was given the power, and it was made its duty, to investigate and make a finding of all facts entering into or forming the basis of rates to be charged for any service supplied by any public utility "furnishing gas, water,

light, heat or power; producing, generating, transmitting or distributing gas, water, light, heat or power; or furnishing telephone, telegraph or street railway service."

To raise funds to defray the expenses of this tribunal, it was provided, in § 8 of the act, that each public utility subject to the provisions of the act shall file with the tribunal "a sworn statement showing its gross earnings from property in this State for the preceding calendar year, and at the same time shall remit to the State Treasurer the sum of $2 for each $1,000 of such gross earnings as a fee for the fact-finding facilities afforded by this act, which fee shall be in addition to all property, franchise, license or other taxes, fees or charges now or hereafter prescribed by law. * * * The tribunal is hereby authorized to inspect the income tax return of any public utility for the purpose of checking up its gross earnings."

The Fort Smith Gas Company is engaged in the distribution of natural gas in the city of Fort Smith. The gas which it distributes is purchased from various pipe line companies. As required by the act from which we have quoted, the Fort Smith Gas Company made report of its gross earnings for the year 1932, from which it appeared that gas which had been furnished by the pipe line companies to the Fort Smith Gas Company at a cost of $214,769.01 had been distributed to the consumers for the price of $407,588.83. The Fort Smith Gas Company reported its gross earnings to be the difference between what it had paid for the gas and the price received for it, and made a tender of the tax imposed by § 8 of the act on that basis. The tender was declined by the Commissioner of Revenues, who insists that the tax should be paid on the whole amount for which the gas was sold, and not on the difference between the purchase price and the sale price. The court below sustained that contention, and entered a judgment accordingly, from which is this appeal.

As appears from the facts stated, the question presented for decision is whether the term "gross earnings"

should be construed as being synonymous with the term "gross receipts."

The question here presented was thoroughly considered by the Court of Appeals of the District of Columbia in the case of *District of Columbia* v. *Georgetown Gaslight Co.*, 45 Appeal Cases Dist. of Columbia, page 63. An act of Congress directed the collector of taxes of the District of Columbia to collect a tax on the gross earnings of banks, electric lighting, telephone, and gas companies doing business in the District of Columbia. The act required all street railway companies to pay a tax on their gross receipts, and insurance companies to pay on their gross premium receipts. The Georgetown Gaslight Company filed a report with the assessor of the district showing its gross earnings to be $97,719.58, and the assessor called upon the company for a statement as to how it arrived at the sum returned. The company furnished a statement showing that the total sales from gas and its byproducts were $160,939.99, and the cost of the raw material actually entering into the manufacture of the gas was $63,220.41, and that by deducting the cost of the raw material from gross receipts the company found and reported its gross earnings as $97,719.58, which was refused.

A demurrer was filed, which presented to the trial court the question whether the Gas Company should have been allowed the deduction of the cost of the raw material used in the manufacture of the gas in determining what were its gross earnings. The District of Columbia appealed from a ruling favorable to the Gas Company, and the synopsis of the brief filed by its counsel on its appeal to the Supreme Court of the District of Columbia indicates that an exhaustive investigation of the authorities had been made, and the opinion on appeal showed the cases cited were carefully considered and properly distinguished.

It was insisted there, as it is here, that gross receipts and gross earnings are in a broad sense equivalent terms, and that a tax on gross earnings and on gross receipts is one and the same thing.

It was pointed out in the opinion cited that with certain sorts of business concerns gross earnings and gross receipts constitute precisely the same sum of money, and it was there said that: "A railroad company engaged entirely in the rendition of services for which it received compensation, and neither producing nor furnishing any tangible commodity to persons as an incident to the rendition of the services, may have as its 'gross receipts' and its 'gross earnings' precisely the same moneys." But it was pointed out very clearly that it would be an economic fallacy to assert their identity in all cases or in any case where the revenue or income was derived from purchases and sales or from manufacturing and selling. There the taxpayer manufactured and sold gas, and it was there said: "It is engaged in selling a commodity, gas, which it produces by processes of manufacture by converting raw materials which have been purchased by money from its capital and its net surplus of earnings of former years which has been added to its capital. Large sums are used to buy those raw materials; and when the gas which is made from them is sold, there comes back to the company as a part of the money received from such sales the capital used in the original purchase of raw material, and when it thus comes back to the company it is returned to capital." This is equally true of gas bought and resold as in the case before us.

Among numerous other cases there cited and quoted from was the case of *People ex rel. Brooklyn Union Gas Co.* v. *Morgan,* 114 App. Div. 266, 99 N. Y. Supp. 711, where, upon facts identical to those involved in the District of Columbia case, the Supreme Court of New York, in the Appellate Division, said: "The comptroller has thus fixed the tax, not on the 'gross earnings' of the relator, as required by the statute, but on its gross receipts. Capital of a corporation which must first be invested before it begins to earn anything cannot be said to be a part of the earnings of such corporation merely because it is turned into cash, and thus in one sense becomes a receipt of the corporation. Earnings do not in-

clude capital, but are the productions or outgrowth of capital."

If the gas was not sold for something more than its cost, there would be "gross receipts," but not "gross earnings." If sold for more than it cost, the difference between the cost price and the sale price would be the gross earnings. If, for any reason, it was important to determine, as would be necessary in an income tax return, what the net earnings or net profits were, it would be necessary to know what the operating expenses had been, and to deduct these also.

If a merchant buys goods for a thousand dollars, and sells them for two thousand dollars, the gross receipts would be two thousand dollars, but his gross earnings would be only one thousand dollars, and his net profits or net earnings would be this thousand dollars less the operating expenses, and this is as true of gas as it is of goods or other merchandise.

These terms are explained and defined in our Income Tax Act (act 118, Acts 1929, vol. 1, page 573), under which income tax returns are made, to which the Fact-Finding Tribunal is given access by § 8 of the act of 1933 for the purpose of checking up the gross earnings of the utilities subject to the tax here sought to be collected. See also *Sims* v. *Ahrens*, 167 Ark. 557, 271 S. W. 720.

There is nothing to indicate that the General Assembly did not use the term "gross earnings" in the sense in which it is ordinarily employed and as ordinarily understood, and, if this is true, it cannot be interpreted as meaning the collection of invested capital used to purchase an article bought for resale, which it would be if the Gas Company is required to pay a tax on the purchase price of the gas which it bought to distribute and resell.

The case of *Railway* v. *Shinn*, 52 Ark. 93, 12 S. W. 183, is cited as holding to the contrary. But such is not its effect. There a short line railroad operating between two towns only a few miles apart agreed to pay the operator of a ferry, which the railroad was required to use, one-fifth of the actual gross earnings of the railroad

as ferriage. It was held that the railroad should pay the sum agreed without deduction for hack fare incurred in completing a journey between the two towns. In other words, the operating expense could not be considered in determining the gross earnings. The Gas Company here asks no deduction for operating expenses, but has offered to pay on its gross earnings without credit for that expense.

It will not do to say that the Legislature said one thing, but meant another. We must ascertain the legislative intent from the language employed. Act 493 of the Acts of 1921 (General Acts 1921, page 472), imposing a tax on the gross receipts of certain insurance companies, clearly indicates that when the General Assembly wishes to tax gross receipts, it says so, and we may not interpolate that intention when the language employed indicates an intention to the contrary.

We conclude therefore that the State Revenue Commissioner should have accepted the tender made by the Gas Company in payment of the tax on its gross earnings.

This opinion, when delivered, expressed the views of the majority of the court as it was then constituted. Through a change in the personnel of the court, it does not express the views of the majority of the court as now constituted. It is therefore no longer the opinion of the court. But, inasmuch as it does express the views of Justices McHaney, Butler and myself, the remaining members of the court who originally made it, it is now filed as a dissenting opinion.